UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

               Plaintiff,

       v.

SAMUEL MALDONADO,

               Defendant.
_____

<u>REPORT & RECOMMENDATION</u>

11-CR-6166CJS

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated October 4, 2011, all pretrial matters in the above-captioned case were referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 12).

Defendant Samuel Maldonado ("Maldonado") has been charged in a three-count indictment.  (Docket # 11).  The first count charges Maldonado with conspiracy to distribute and to possess with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. § 846.  (*Id*.).  The second count charges Maldonado with possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  (*Id*.).  The final count charges Maldonado with possession of a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (*Id*.).  The indictment also contains a forfeiture allegation.  (*Id*.).

Currently pending before the Court is Maldonado's motion to suppress oral and written statements he made to Rochester Police Department Investigator Dennis Gonzalez ("Gonzalez") during an interview following his arrest on July 27, 2011.  (Docket # 17).

Specifically, Maldonado contends that during the interview with Gonzalez, he was suffering from symptoms of heroin withdrawal.  (Docket # 20).  Maldonado affirms that, in exchange for his written statements, Gonzalez offered him a drug called soboxone, which allegedly alleviated Maldonado's heroin withdrawal symptoms.  (*Id.*).

On December 19, 2011, this Court held an evidentiary hearing at which Gonzalez testified regarding the challenged statements.[1]  (Docket # 24).  The defense called no witnesses. Following the close of the suppression hearing, Maldonado sought permission to submit medical records from the jail in which he was held following his arrest.  This Court set a deadline of January 26, 2012 for Maldonado to make such a submission.  (Docket # 26).  Maldonado has submitted nothing further to this Court.

For the reasons discussed below, I recommend that the district court deny Maldonado's motion to suppress the statements.[2]

## FACTUAL BACKGROUND

### I.  Testimony of Investigator Gonzalez

Investigator Dennis Gonzalez testified that he has worked for the Rochester Police Department for over twenty-one years and has been an investigator for the last ten years.  (Tr. 6).

---

[1]  The transcript of that hearing shall be referred to throughout as "Tr. __."  (Docket # 25).

[2]  Also pending before the Court is Maldonado's motion to suppress physical evidence seized from 1000 Ridgeway Avenue, Apartment # 3 in Rochester, New York.  (Docket # 17).  I recommend that the district court deny that motion as well on the ground that Maldonado has not established standing to challenge the search of that location.  In order to seek suppression, a defendant must establish that the challenged search violated his own Fourth Amendment rights.  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).  In order to do so, he must establish "a legitimate expectation of privacy in the invaded place."  *Id.* at 143.  Maldonado has failed to do so here; he has submitted no affidavit or other evidence asserting a privacy interest in 1000 Ridgeway Avenue, Apartment # 3, despite the opportunity to do so.  (Tr. at 3-4).

Gonzalez currently investigates narcotics trafficking, violent crimes and possession of firearms. (*Id*.).

Gonzalez testified that on July 27, 2011, at 11:40 a.m., he participated in the execution of a search warrant at 1000 Ridgeway Avenue, Apartment # 3 in Rochester, New York.  (Tr. 6-7, 30).  There, the searching officers found cocaine, a gun and materials used to cut, mix and package drugs.  (Tr. 7-8).  When he entered the residence, Gonzalez observed Maldonado sleeping on the couch.  (Tr. 30).  Following the discovery of the drugs and gun, Maldonado was arrested and transported to the Public Safety Building in Rochester, New York, where he was taken to an interview room on the third floor.  (Tr. 8, 31).  Gonzalez testified that at that time Maldonado was "alert and coherent."  (Tr. 32).

At approximately 2:29 p.m., Gonzalez was informed that Maldonado wanted to use the restroom.  (Tr. 9).  Gonzalez testified that he escorted Maldonado from the interview room to the men's room – a distance of approximately ten feet.  (Tr. 10).  Gonzalez accompanied Maldonado into the restroom and observed Maldonado relieve himself and then wash his hands. (Tr. 9-10, 32).  Maldonado and he were in the restroom for approximately three minutes.  (Tr. 32).  Gonzalez escorted Maldonado back to the interview room, handcuffed Maldonado to the table inside the interview room and then left the room.  (Tr. 10).

Gonzalez returned to the interview room at 2:39 p.m.  (Tr. 11).  Gonzalez identified himself and removed the handcuffs.  (Tr. 11, 33).  Gonzalez testified that he asked Maldonado whether he could read and write English, and Maldonado responded that he could. (Tr. 11, 12).  Gonzalez also asked Maldonado about his education level, to which Maldonado responded that he had completed twelfth grade.  (Tr. 12, 40).  According to Gonzalez, their entire

3

conversation was conducted in English.  (Tr. 12, 34).  Gonzalez never asked Maldonado whether

English was his first language, although he concluded from listening to Maldonado's

pronunciation that he was Hispanic.  (Tr. 34-35).  Gonzalez never asked Maldonado if he needed

an interpreter.  (Tr. 41).

Gonzalez testified that he asked Maldonado to read aloud from a card containing a

recitation of *Miranda* rights.  (Tr. 12, 14; G. Ex. 1).  Specifically, Gonzalez testified that he

asked Maldonado to read each of the five enumerated rights out loud.  (Tr. 14, 33).  After

Maldonado had read each right, Gonzalez asked him whether he had understood what he had

read and told him if "he was unsure or unclear of anything that he read, . . . I would then explain

it to him."  (Tr. 14).  Maldonado responded "yes" each time Gonzalez asked him if he had

understood the articulated right.  (Tr. 14-16, 34).  Gonzalez testified that after Maldonado had

read each right and told him that he understood it, Maldonado agreed to speak with Gonzalez.

(Tr. 16-17; G. Ex. 1).

According to Gonzalez, Maldonado never indicated to him that he did not

understand what he had read.  (Tr. 16).  Maldonado had no apparent difficulty reading the card

and did not appear to be confused.  (Tr. 17, 35).

Gonzalez testified that he then began to interview Maldonado about the evidence

seized from apartment.  (Tr. 18).  According to Gonzalez, Maldonado was "[c]ordial,

cooperative, coherent, wide awake, didn't seem to be under any stress, or in any pain."  (*Id*.).

Gonzalez testified that the interview lasted approximately one hour.  (Tr. 19).

At the end of the interview, Gonzalez prepared a written statement summarizing

the information Maldonado had provided him.  (Tr. 19, 21; G. Ex. 2).  Gonzalez asked

4

Maldonado to read the written statement out loud.  (Tr. 21).  Gonzalez testified that he told

Maldonado that "[i]f there w[ere] any corrections, anything he wanted deleted or added to, at that

point I would be more than happy to change it, but I would need for him to read it out loud,

please."  (Tr. 22, 37-38).  According to Gonzalez, Maldonado then read the statement aloud and

when he was finished, he signed both pages and initialed the last page.  (Tr. 22, 37; G. Ex. 2).

Gonzalez testified that Maldonado did not have any difficulty reading the statement and did not

ask him to change anything in it.  (Tr. 22, 39).  The interview concluded at 3:58 p.m.  (Tr. 24).

The last sentence in the written statement that Gonzalez prepared for Maldonado

stated, "I give this statement of my own free will and was threatened or made any promises."

(Tr. 23; G. Ex. 2).  Gonzalez testified that he had inadvertently omitted the word "not" before the

word "threatened" in that sentence.  (Tr. 23, 38).  Gonzalez testified that he did not notice the

mistake in the statement on that day.  (Tr. 38).

According to Gonzalez, Maldonado was not threatened or promised anything in

order to speak with Gonzalez.  (Tr. 23, 25).  They did not discuss the possibility of cooperation at

any time before Maldonado signed the written statement.  (Tr. 24).  According to Gonzalez,

Maldonado never complained that he was suffering from any illness, injury or other medical

condition.  (Tr. 25).  Gonzalez further testified that neither he nor anyone else in his presence

offered Maldonado any medication or any other substances.  (*Id*.).  Gonzalez testified that he

never gave Maldonado soboxone.  (Tr. 29, 36).  Maldonado never asked Gonzalez to stop

questioning him or told him that he no longer wished to speak to him or wanted an attorney.  (Tr.

25-26).

According to Gonzalez, based upon his training and experience, he was capable of recognizing the characteristics of individuals under the influence of alcohol or drugs, as well as the symptoms of individuals who are suffering from withdrawal from controlled substances.  (Tr. 26).  Gonzalez described the symptoms of withdrawal as nausea, vomiting, shaking, nervousness and profuse sweating.  (Tr. 27).  Gonzalez described the symptoms of drugs or alcohol influence as red eyes, dilated pupils, slurred speech and difficulty with balance.  (*Id*.).  Gonzalez testified that Maldonado did not display any of those symptoms or characteristics.  (*Id*.).  Gonzalez further testified that Maldonado did not vomit in the restroom, nor did he have difficultly walking to and from the bathroom.  (Tr. 27-28).

According to Gonzalez, Maldonado never told him that he was suffering from heroin withdrawal or any other condition.  (Tr. 28-29, 35).  Gonzalez did not conduct any tests, such a field sobriety tests, in order to assess whether Maldonado was intoxicated.  (Tr. 36).

## II.  **Maldonado's Affidavit**

In support of his motion, Maldonado submitted an affidavit asserting that before being questioned, he "explained to Detective Gonzalez that I was suffering from the withdrawal of heroin.  The withdrawal caused me to feel like I had the flu.  My stomach was nauseated, and I could not concentrate on what Detective Gonzalez was asking me or on my responses."  (Docket # 20 at ¶ 8).  Maldonado further asserted that Gonzalez continued to question him after Maldonado told him about the withdrawal.  (*Id*. at ¶ 9).  According to Maldonado, at one point during the interview, Gonzalez offered to give him the drug soboxone if Maldonado would agree to speak with him and sign a written statement.  (*Id*.).  He claimed that he accepted the soboxone

6

from Gonzalez and "the withdrawal symptoms subsided and were replaced by a feeling of

euphoria or a 'high.'"  (*Id*. at ¶ 10).  According to Maldonado, when he signed the written

statement, he "was in withdrawal and/or under the influence of soboxone."  (*Id*. at ¶ 11).


## DISCUSSION

Statements made during custodial interrogation are generally inadmissible unless

a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436

(1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's

statements that are the product of custodial interrogation unless it demonstrates that the

defendant was first warned of his Fifth Amendment privilege against self-incrimination and then

voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.

> Custodial interrogation exists when a law enforcement official
> questions an individual and that questioning was (1) conducted in
> custodial settings that have inherently coercive pressures that tend
> to undermine the individual's will to resist and to compel him to
> speak (the in custody requirement) and (2) when the inquiry is
> conducted by officers who are aware of the potentially
> incriminating nature of the disclosures sought (the investigative
> intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*,

834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).

Here, the government does not contest that Maldonado was subject to custodial

interrogation.  Rather, the issue is whether Maldonado was advised of his rights and lawfully

waived them before making statements to Gonzalez.  To establish a valid waiver, the government

must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's

7

rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Statements made to police while the speaker is intoxicated or under the influence of drugs or alcohol are not *per se* involuntary.  *Scott v. Fisher*, 652 F. Supp. 2d 380, 431 (W.D.N.Y. 2009) (collecting cases).  Rather, the court must evaluate whether the defendant understood his rights and knowingly waived them.  *See United States v. Wyche*, 307 F. Supp. 2d 453, 463 (E.D.N.Y. 2004); *Avincola v. Stinson*, 60 F. Supp. 2d 133, 160 (S.D.N.Y. 1999).

On the record before me, I find that Maldonado was properly advised of his *Miranda* rights and voluntarily waived them before speaking to Gonzalez.  Gonzalez testified that Maldonado read his *Miranda* rights aloud from a rights card and indicated to Gonzalez that he understood each of those rights.  Maldonado told Gonzalez that he could read and write in English and never requested an interpreter.  *See United States v. Santiago*, 720 F. Supp. 2d 245, 252 (W.D.N.Y. 2010) (although language barrier must be considered in determining the voluntariness of statements, critical issue is whether "the suspect is advised of his rights in a language that he understands").  Indeed, the entire interview was conducted in English and concluded after Maldonado read aloud the entirety of his written statement.  At no time during the interview did Maldonado request an attorney or indicate that he wanted to stop the interview.

The record further establishes that Maldonado was not threatened, nor were any promises made to him, in order to induce him to speak.  I credit Gonzalez's representation that he did not offer Maldonado soboxone in exchange for his statements.

8

I further find that Gonzalez testified credibly that he was familiar with the symptoms of drug and alcohol intoxication, as well as the symptoms of withdrawal, and that Maldonado displayed none of those symptoms. *United States v. Figueroa*, 1993 WL 159966, *4 (S.D.N.Y. 1993) (crediting agents' testimony that they were knowledgeable about symptoms of withdrawal and that defendant did not exhibit those symptoms despite his sworn statement that he was suffering from withdrawal). Even if Maldonado had been suffering from some withdrawal symptoms, Gonzalez testified credibly that Maldonado appeared coherent and cooperative and communicated effectively with him. *United States v. Jetter*, 1994 WL 17530, *8 (D. Conn. 1994) (waiver was voluntary even though defendant was tired, uncomfortable and suffering from withdrawal symptoms where he communicated effectively with officers and appeared to understand what was happening).

Accordingly, I recommend that the district court deny Maldonado's motion to suppress his oral and written statements made on July 27, 2011.

## CONCLUSION

For the reasons discussed herein, I recommend that the district court deny Maldonado's motion to suppress statements made on July 27, 2011, as well as his motion to suppress the physical evidence seized from 1000 Ridgeway Avenue, Apartment # 3. (Docket # 17).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
February   17  , 2012

9

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[3]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>**Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**</u>

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                       *s/Marian W. Payson*
                                         MARIAN W. PAYSON
                                  United States Magistrate Judge

Dated: Rochester, New York
       February   17  , 2012

---

[3]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).